RAWSON v. HARDY et al.

No. 5395. Decided July 20, 1935. (48 P. [2d] 473.)

132

*Joseph E. Evans, De Vine, Howell, & Stine,* and *A. W. Agee,* all of Ogden, for appellants.

*J. Quill Nebeker, Arthur Woolley,* and *L. J. Holther,* all of Ogden, for respondent.

WOLFE, Justice.

Formerly, an opinion was written in this case and a petition for rehearing granted. The former opinion is recalled and this opinion substituted.

This is an equitable action to set aside a deed alleged to have been made by Clarence Hardy while incompetent, and, second, to cancel a release of a mortgage, the execu-

tion of which it was averred was obtained from the alleged incompetent without consideration and by means of fraud. The deed which it was sought to set aside was one made by Clarence Hardy, sometimes known as Clarence P. Hardy, dated June 1, 1923, conveying to Lewis M. Hardy, his brother, a certain farm located at Roy, Weber county, Utah. The release of mortgage which it was sought to have canceled was dated December 14, 1926, and recorded January 19, 1927. The release was of a mortgage in favor of Clarence P. Hardy on the same property to which he had given a deed on June 1, 1923, and was for $7,500. Judgment was entered against Lewis M. Hardy setting aside the deed of June 1st and canceling the release of mortgage and quieting title in Mary E. Rawson, guardian of the estate of Clarence Hardy. The Hardings and the Hamblens have appealed. As to how the Hamblens were interested will appear later as we state more of the facts.

The complaint was brought in the name of Mary E. Rawson, as guardian of the estate of Clarence Hardy, an incompetent. The defendants Harding demurred generally to the complaint on the ground that it did not state a cause of action in favor of the plaintiff and against them. The demurrer was overruled, and such ruling was assigned as error. Contention is made that the action is one in favor of Mary E. Rawson; the matter reading "as Guardian of the Estate of Clarence Hardy, an Incompetent" being merely descriptio personae. Since the complaint shows no cause of action in her but in her ward, it is argued, therefore, the complaint fails to state a cause of action in her favor. It is true that the correct way of bringing an action on behalf of a ward is to entitle it, "Clarence Hardy by Mary E. Rawson, Guardian," etc.; but in this case under the pleadings and the stipulations entered into by the parties it is perfectly apparent that the suit was intended to be brought in behalf of the ward. In determining whether the person is suing in his representative or his individual capacity, the averments of the whole

pleading should be considered. *Bennett* v. *Bennett*, 65 Neb. 432, 91 N. W. 409, 96 N. W. 994; *Wilson* v. *Me-ne-chas*, 40 Kan. 648, 20 P. 468; *Title Guaranty & Surety Co.* v. *Foster*, 84 Okl. 291, 203 P. 231. Any judgment obtained in this case will be binding upon Clarence P. Hardy the same as if it had been brought in his name by the guardian rather than by the guardian for him. Assignment No. 1 and assignment No. 17, which bring up this question, are therefore without merit in this regard.

The appealing defendants also attack the complaint on the ground that it is ambiguous, uncertain, and unintelligible, in that it cannot be ascertained therefrom what the "meditated fraud, imposition, undue influence, and persuasive arts," alleged to have been exercised and practiced upon the ward, consisted of. The special demurrer should have been sustained. The defendants were entitled to have set out the acts which constituted the fraud or the imposition, or the undue influence or the persuasive arts. *Wilson* v. *Sullivan*, 17 Utah 341, 53 P. 994; *Muldoon* v. *Brown*, 21 Utah 121, 59 P. 720. The quoted part of the allegation was a series of conclusions. No illuminating facts to give it content were alleged. Assignment of error No. 1 in that regard is well taken. No assignment is set out charging error on the part of the trial court in admitting evidence over objection in support of these conclusions of fraud. It is not necessary in this case to determine the effect of a failure to object to evidence tendered in support of a conclusion after a special demurrer designed to give content to that conclusion is overruled, because the same evidence in support of the allegation that there was no consideration for the release of the mortgage was tendered in support of the broad allegation of undue influence and fraud. Consequently, in any event it will be necessary to consider the evidence. The main attack of the appeal was on the court's determination that at the time of the making of the deed from Clarence Hardy to Lewis M. Hardy the former was incompetent. The proceedings sur-

rounding that transaction are as follows: In 1916 Clarence's father and mother conveyed to him the land in question which constituted the family homestead, reserving to each, however, a life estate. The father died in 1920, but the mother was still living at the time of the trial. In February, 1923, Clarence decided to go to Long Beach, Cal. Before he left he and his mother entered into an agreement with his brother Lewis for the sale of the farm to Lewis, but the sale was not consummated because they were unable at that time to procure a loan on the land so that Clarence could receive a cash payment. Later, the deed which Clarence now seeks to annul was prepared and executed in Ogden by the mother, and was executed by Clarence in Long Beach and returned to the bank. Clarence deeded his remainder interest and the mother her life estate to Lewis. Lewis caused to be put on the property a first mortgage for $3,200 in favor of the Ogden State Bank, a second mortgage in favor of Clarence for $7,500, and a mortgage for $2,861.65 in favor of the mother to pay for her life interest in the land. Of the $3,200 received from the bank, $540 was given to Joseph Weston to pay off a prior mortgage. The rest was applied to taxes and incidental expenses.

We have examined carefully the testimony which tends to support the allegations of incompetency at the time the deed of June 1, 1923, just last mentioned was given. We believe it inadequate to support the finding that Clarence Hardy at that time was incompetent. There was introduced in evidence the fact that he had been committed to the state mental hospital in Washington for treatment, and remained there about two months, was discharged, and returned to his home at Roy, when again in 1912 he was committed to the Utah mental hospital for treatment, and remained there until May, 1913, when he was again released to his father for treatment under the provisions of section 5413, Comp. Laws Utah 1917. In August 1913, he was returned to the hospital, where he remained until October, 1914, when he was again released upon application

of the father. Most of the evidence regarding his insanity came from the mother, from his wife, and from a brother Arnold and his sister Ada. The fact must be taken into consideration that these are near relatives, naturally interested in preserving for Clarence the property in question. Their testimony was of a rather general nature. They testified that he was morose and at times despondent, and that he brooded over the fact that he was losing his mind. Several neighbors testified as to his appearance between 1914 and 1923. They testified as to his appearance, his countenance, and certain conduct.

The defendant introduced certain depositions of attorneys in Long Beach before whom Clarence had appeared at the time he executed the deed in 1923; also the deposition of a Miss Ackerly in the office of the attorneys. Each testified that he was rational and that he appeared to comprehend the nature of the business, and that there was nothing about him which led them to suspect that he had any mental derangement. There was also the testimony from neighbors on the part of appellants who had frequently seen and dealt with Clarence in a business way who testified that in their opinion he was competent to transact the business of running the farm. A certified copy of the marriage license licensing Clarence to marry Ada Thompson and stating that both parties were capable of contracting marriage, and the certificate of the minister who performed the marriage, that there appeared to be no legal impediment to the marriage, were also introduced. The affidavit for a marriage license in which Clarence swore that he was neither an imbecile nor insane was introduced. Besides this testimony there was the evidence of a number of transactions which Clarence had participated in and letters from Clarence to his brother while the former was in Denver regarding the release of the mortgage, which we shall speak of later.

A review of all the evidence convinces us that the finding that Clarence was not competent to make the deed of June 1, 1923, or that he was not competent to know the

nature of his act in releasing the mortgage, which we shall later speak about, was erroneous. In this case, after the deed of 1923 was made, Clarence received $2,000 from the $3,200 mortgage given to the Ogden State Bank. Later on, after the trade between Lewis Hardy and Dr. Harding was consummated, Dr. Harding sold the property to Robert N. Hamblen for $13,000. The judgment sets aside the deed of June 1, 1923, and restores the property, not to the ward, but the guardian. This is all done without putting either Hamblen or any of the other parties in statu quo. Certainly, under circumstances like these, proof that a prior grantor was incompetent should be clear and indubitable, otherwise much harm could come to his grantees. The proof is not only not clear and indubitable, but to our minds inclines very favorably to the proposition that Clarence during a great part of the time was quite capable of comprehending the nature and probable consequences of the transactions into which he entered. In most of the transactions in which he had a part he was not without shrewdness and bargaining power. The manner in which he actually did transact his business deals and the acumen he displayed lend powerful support to his competency. He seems actually to have expressed better judgment than his brother Lewis in the deal with Harding.

Complaint is made of the court's ruling admitting the complaint and certificate of lunacy and the certificate of commitment by the superior court of Maricopa county, Ariz., to the State Asylum for the Insane. In view of our conclusion from the evidence on the issue of incompetency, including the effect of any evidence of his commitment to the asylum in Arizona, it is unnecessary to consider the question of whether the court erred in admitting as having probative value the certified copy of the warrant of commitment.

It remains to consider the evidence in support of the allegation of fraud practiced and in support of the allega-

tion that Clarence received no consideration for the release of the mortgage. When we enter this field we find ourselves in the region of doubt and speculation. The court found in the identical language of the complaint that "there was meditated fraud, undue influence and persuasive arts" practiced upon Clarence by defendant J. Dwight Harding, and that he was defrauded by the said Harding to make and execute to the said Harding, an instrument in the form of a release, purporting to release the premises in question from a lien of a $7,500 mortgage given by Lewis to Clarence in 1923, as aforesaid. The court also found in the same finding, No. 11, that the said release was given without consideration. The facts surrounding this phase of the case are as follows: While Clarence was in Colorado, Lewis found himself in financial difficulties in the matter of paying taxes and meeting interest and principal payments on the mortgage to the bank. He talked with Mr. Hinckley, the real estate agent, about Dr. Harding's dairy farm at Huntsville, and later with Dr. Harding himself, who first told him that there was not enough equity in the place at Roy for him, Dr. Harding, to consider it. Dr. Harding told him later that if he could get his brother to come in with him they might make a deal, meaning by that that if his brother would release his mortgage a trade might be made. Lewis wrote to Clarence, but the letter was not produced. However, a letter came from Clarence dated September 28, 1926, in which he stated, among other things, as follows:

"It seems to me that $30,000.00 is pretty steep for that piece you are trading for. I don't see how you can assume that much. If you can get it for $28,000.00 I will release the mortgage, because I think a higher figure than that would be more than you could stand."

A copy of a contemplated telegram, Exhibit 8, was introduced, dated October 9, 1926, which Lewis testified he did not remember sending. It reads as follows:

"Ogden, Utah Oct. 9th, 1926
"Mr. C. P. Hardy, 4554 West 33rd Ave.,
    Denver, Colorado.
   "Your mortgage will be the same as the one you have here. We cannot succeed here. It is up to you to permit the trade or take this place back. Which will you do? Taxes and interest will be unpaid here. Will have constant income on other place. Can pay Mother and some to you annually. We will move at once. Telegraph answer Sunday."

Hinckley testified that he had prepared it while Lewis was in his office, and that he delivered the original to Lewis who said that he would send it to his brother. If Hinckley's testimony is to be believed, it tends to show what was in Lewis' mind and gives support to the contention that Lewis and not Harding was supposed to obtain the release of the mortgage.

Hinckley, agent of Harding, and Harding himself and Lewis testified that in the negotiations for the trade the factor which Harding made a condition was that Lewis obtain a release from his brother Clarence on the Roy property. Evidently Lewis had some difficulty in obtaining this release so that the parties set out on a different course through an agreement dated October 7, 1926, in which agreement it was specified that there should be a $12,000 federal farm loan placed on the Huntsville property; the proceeds to be turned to Dr. Harding. Lewis was to turn the Roy property to Harding subject to the mortgage of $3,200 in favor of the Ogden State Bank, which mortgage was to be paid by Dr. Harding. The whole purchase price for the Huntsville property was named at $30,000. After the $12,000 to come from the Federal Land Bank mortgage was applied on this $30,000, the payments of the remainder were to be made according to two plans. If Lewis could within 30 days get a release of the mortgage for $7,500 from his brother Clarence, such amount was to be credited on the purchase price, and after that Lewis was to pay $500 on the 1st day of November, 1927, $500 on or before the 1st day of November, 1928, $750, November 1, 1929, $750, No-

vember 1, 1930, and $1,000 on the 1st of November, 1931, and $1,000 on the 1st day of November of each and every year thereafter until the full purchase price had been paid. There was nothing stated in the agreement as to the amount of credit Lewis should have for his equity above the mortgages on the Roy property. The other plan was in case Lewis could not obtain a release of the $7,500 mortgage from his brother Clarence, and is not necessary to detail. The materiality of the first plan shows that it was contemplated that Lewis and not Harding was to obtain the release. Lewis did not obtain the release within the 30 days, but conveyed with his wife Ella M. Hardy the farm at Roy to Harding by deed dated October 7, 1926, and recorded November 24, 1926. When the deed was delivered is not shown by the evidence, but Lewis went into possession of the property at Huntsville, according to the testimony of Dr. Harding, in October, 1926. The deed to the Huntsville property dated November 1, 1926, was not recorded until some time in the year 1927. The Federal Land Bank loan was never obtained. Judging from the implications of the record, pending the obtaining of it, Lewis gave notes amounting to $12,000 secured by a mortgage on the Huntsville property, but evidently the mortgage and the deed were retained without recording either to permit the snow to clear away from the ground so that the appraiser for the Federal Land Bank could make his inspection, or, if we are to believe Harding, to obtain releases from Clarence and his mother. When it was found that the bank would not loan the money, the mortgage of Lewis was permitted to stand. But later, Lewis having defaulted in the payments, Dr. Harding foreclosed the mortgage and sold his certificate of sale to George Hodson for $13,750; Hodson paying in addition to Lewis something between $1,500 and $2,000 for the live stock and chattels.

Retracing our steps to see what happened in respect to the Roy property, we find that Clarence in December of 1926 sent to his brother Lewis a release of the $7,500 mort-

gage, which release was given by Lewis to Hinckley, and either Hinckley recorded it or gave it to Dr. Harding and he recorded it. It is the circumstances surrounding this release in regard to which there is much confusion and uncertainty. There seems to be no question but that Clarence received no money or tangible consideration for the release. The real question which divides the parties in this matter is as to whether Dr. Harding obligated himself with Clarence to secure Clarence by an interest in the Huntsville property as a consideration for his releasing his mortgage on the Roy farm, or whether the obligation to so secure Clarence belonged to Lewis. The court found that Dr. Harding had induced Clarence to release the mortgage by fraud and that there was no consideration therefor. The finding is predicated mainly upon several letters from Dr. Harding to Clarence after the 30-day limit specified in the agreement of October 7th had transpired. In a letter of November 18, 1926, Dr. Harding wrote to Clarence. In order to appreciate the full purport of Dr. Harding's letter, we set it out in full:

"Ogden, Utah, Nov. 18, 1926

"Mr. Clarence Hardy, Denver, Col.

"Dear Sir: I am a total stranger to you and now that a deal has been consummated whereby the farm in Roy has been deeded to me and your brother Lewis has purchased my farm in Huntsville I am writing concerning your mortgage. Now I have not spent one hour with Lewis in all our conversation. I owned a fine farm, well equipped and well stocked and was proud of it—its buildings, its location, etc. One day Mr. Hinckley asked if I would sell it and I refused to give him any positive answer. Later I reconsidered it and he made me a proposition to sell it to Lewis Hardy and I investigated his moral, physical and spiritual life, and made him thru Mr. Hinckley a proposition, insisting that Lewis go and investigate and ask questions of the neighbors, the man who was employed to run it and if he was thoroughly satisfied I would make the offer. One time he spoke of getting you to turn your mortgage on the place he (Lewis) purchased, however this was not demanded when he went on the farm. Now I do not need the cash, in fact I want it out earning interest and want it safe, therefore I made Lewis a long time offer—a reasonable rate of interest and I feel sure and confident he will win, as his cows and

chickens, etc., will be ready cash every month and he can make a living on the side after he is once settled. Had I not believed this I would not have sold to him.

"Now I must come to the point. I have some offers for the old home in Roy—one offer is from Italians—the other from Japs. I have not sold yet but I may sell any day and shall sell subject to the Bank First Mortgage and subject to your second mortgage. These people are anxious to keep your mortgage on the place and I can dispose of it easier with your mortgage than I can without it. Now to be fair with you—once this place is sold you know these foreigners buy the first mortgage and then demand you buy it or close the second or forfeit it. This could be done and another way they would not surrender the second mortgage until it was due.

"Now I wanted to place this before you so you would not blame me. I want you to consider it and do as your best judgment prompts you. It will be all right with me. I expect to close the deal finally with Lewis soon, make out all the final papers and close the deal. I expect to close the deal on the old place soon (Hardy Place at Roy) and turn over everything as it is. With your mortgage it will sell for a little more and a little better than it would without the mortgage.

"Now, in conclusion you may do as you think best either leave it on the old farm or you can place it on the farm Lewis is buying. In my opinion the latter is a safer and by far a better loan than where it is now. You will say that I am saying this because I want you to change it—not so. I am trying to co-operate with you and do what is right. I haven't spent 60 minutes on this deal—some little misunderstanding has crept out among some of the people—perhaps due to poor judgment on account Real Estate dealers or perhaps partly due to some misunderstanding on the part of some of your relatives.

"Hoping you do not misunderstand me and hoping you will write me and give me your opinion and I shall co-operate with you and try and help you, I am,

"Yours very respectfully,
"[Signed] J. Dwight Harding."

On December 10, 1926, he wrote again to Clarence as follows:

"Ogden, Utah, Dec. 10, 1926.
"Mr. Clarence P. Hardy, Denver, Colorado.

"Dear Sir: *Sometime ago I wrote you about sending the release for the mortgage to the 'State Bank of Ogden' and in exchange I would gladly turn over a mortgage properly executed to the Bank attending to this detail in person for you.* Now I am closing the deal with Lewis

about Tuesday of next week and selling my equity in the old Hardy Estate at Roy before the 20th of Dec. Should you desire your mortgage left where it is, kindly inform me, so there will be no misunderstand(ing), as you can not release your mortgage after I once sell the equity.

"I do not want to be unfair, however I must act now and you are to understand that there is no underhand work or that I am selling my equity secretly, but giving you every chance to do what you think is the best.

"Kindly inform me at once concerning your attitude on this matter.

"Hoping you understand me and wishing you every success, I am,

"Yours very respectfully,

"[Signed] J. Dwight Harding."

After this letter of December 10th, Clarence sent a release, not to the Ogden State Bank, but to his brother Lewis, and Lewis turned it over to Hinckley or to Dr. Harding, who recorded it. Dr. Harding later sold the Roy farm to Robert N. Hamblen, who had no knowledge of the negotiations or transactions leading up to the release of the mortgage of Clarence.

In view of all the evidence, we feel that we cannot make a satisfactory determination as to whether it was Dr. Harding's or Lewis' duty to see that Clarence received an interest in the Huntsville property. The case was tried below on the theory that Clarence was incompetent and, perhaps for that reason, the possibilities of further exploring this question were not as fully pursued as they might have been. Under the unsatisfactory state of the evidence, we do not believe that we can say that the record shows that the plaintiff has proved that Dr. Harding had the duty to see that Clarence was secured or that there is sufficient evidence of fraud on his part. There is no question but that apparently from Dr. Harding's letters he was anxious to obtain a release of Clarence's mortgage. His letters are consistent with an urging of Clarence to respond to Lewis' importunities to release the mortgage. Even the statement, that "sometime ago I wrote you about sending the release for the mortgage to the 'State Bank of Ogden' and in exchange I

would gladly turn over a mortgage properly executed to the Bank attending to this detail in person for you," appears to be not a promise but a statement of what he says he formerly wrote to Clarence. Moreover, there is no letter introduced by Harding to Clarence showing where he actually made such promise. Furthermore, the statement is consistent with the thought on Dr. Harding's part that while the deed to the Huntsville property was still in his possession he would accomplish the placing of the mortgage thereon in accordance with what he might have understood to be Lewis' obligation. In other words, he would simply be doing himself what Lewis would be supposed to do for the exchange of the release when Lewis obtained the deed. The letters of Dr. Harding, of course, show a subtle and rather foxy method of attempting to influence Clarence, but we cannot say that, under the present state of the evidence, this should be pushed to the extent of saying that he had practiced fraud upon Clarence. Fraud must be clearly proved. The true nature of the final transaction between Lewis and Harding is only hazily upheld by the record. As late as August 16, 1927, Clarence, apparently then rational, wrote to Harding as follows:

> "Denver, Colo., Aug. 16, 1927.
>
> "Dr. J. Dwight Harding, 717-718 Eccles Bldg., Ogden, Utah.
>
> "Dear Sir: I wrote to my brother Lewis in regard to the property about which you wrote me some time ago. I have urged him a number of times to get this matter straightened up. I have written to him twice since receiving your letter and was waiting for his reply before answering yours. If I had known he was going to act like this, I would never have consented to the trade. I can't get away from here as it is all I can do to make a living and get along, and don't see why he can't manage it without my going there. *It was understood it was up to him when we traded. I don't understand his attitude.* It would sure be a relief to me if things were fixed up all right." (Italics ours.)
>
> "Very truly yours,
>
> "[Signed] Clarence P. Hardy," etc.

Evidently Clarence had in mind that Lewis had the obligation to secure him. If it was Lewis' obligation to secure

Clarence for his release of the mortgage on the Roy property, then certainly a judgment against Dr. Harding for $7,500 in favor of Clarence would be a grave injustice. If Dr. Harding sold the Roy property to Hamblen for $13,000 and paid $5,500 to the Ogden State Bank and Mrs. Hardy to clear off the mortgages, he received $7,500 net on the Roy property. He finally realized out of the foreclosure of his Huntsville property $13,000, or a total of $20,500. If the property were worth anywhere near $30,000, he is not benefited very materially by the transaction. If he is compelled to pay the $7,500, he will obtain a net of $13,000 which would be quite inadequate. Under all these circumstances, we feel that the proof, under the present state of the record, is not sufficient for us to make a judgment on the question of fraud and that the consideration was to move from Dr. Harding. Harding must not be made to respond if it was Lewis' obligation to furnish the consideration for the release. The record does not sufficiently reveal whether Harding credited $7,500 on the purchase price, and whether, if he had done so, it would have resulted in Lewis not being in default or whether the credit was to be on the $13,000 of notes given by Lewis or on something additional claimed to be owing by Lewis.

The case is remanded to the lower court for further proceedings on these issues, with instructions to permit the parties to amend the pleadings in respect to fraud and lack of consideration if they be so advised, and to introduce evidence on such issues, thereupon making a conclusion and judgment in accordance with its findings thereon. Costs to the appellants.

ELIAS HANSEN, C. J., and FOLLAND, J., concur.

MOFFAT, Justice (dissenting).

I cannot concur in the opinion written by Mr. Justice WOLFE on the rehearing of this cause. I dissent especially from that part of the opinion relating to remanding the

cause to the district court for a new trial, and the taking of evidence on the question of consideration. I am of the opinion that the evidence is unusually clear that Clarence Hardy received no consideration for the release of the mortgage. I am also of the opinion that Dr. Harding was enriched at the time he received the release of the mortgage from Clarence Hardy to the extent as stated in the original opinion. When Dr. Harding received the deed to the Roy property, it was made subject to the mortgage of Clarence Hardy. That deed was dated October 2, 1926, and recorded November 24, 1926. The release which Dr. Harding received from Clarence Hardy was dated December 14, 1926, at Denver, Colo., and was recorded on January 14, 1927. In so far as this record discloses, this release of mortgage was secured from Clarence Hardy solely upon the representation and correspondence of Dr. Harding; anything else in relation to the release of that mortgage is a matter of inference.

EPHRAIM HANSON, Justice.

I concur in the views expressed by Mr. Justice MOFFAT in his dissenting opinion.